May it please the Court, my name is Kathryn Kimball Windsor, and I represent the appellant Jonathan Glenn Turner in these two cases. I'd like to reserve five minutes for rebuttal. The cases, which arise from separate factual incidents, both raise the intertwined issues of Mr. Turner's mental health and his legal representation, including his self-representation in the 2012 case. The overview of this case is that, despite strong indications that Mr. Turner was mentally ill, the defense was denied Criminal Justice Act funds for a psychiatric expert to pursue a defense of diminished capacity. This was preceded and followed by major problems with Mr. Turner's representation in both cases, culminating after an invalid FREDA waiver in Mr. Turner representing himself in the 2012 trial in a medicated, highly agitated and paranoid state, ostensibly believing that there was a plot to get him between the two district court judges, his former defense counsel, his current advisory counsel, the The court determined, without submitting this issue to the adversarial process at all, that Mr. Turner was malingering, that he was being manipulative, that he was purposefully trying to create error. And what I'd like to do is start at the root of the problem, the claim that we raised in both cases, which is the denial of the application for Criminal Justice Act funds for the psychiatric evaluation. Can you help me with the timeline on that? I thought that, I think it was Mr. Harley had requested those funds, but it was after the liability phase, it was before sentencing. Is that correct? That's correct. The timeline is quite complicated here, but the application by Mr. Harley was for the 2009 case. So for that case, he was requesting the expert for exploration of a new trial motion and for help with sentencing. He also, though, in the application said that he was applying as well for the 2012 case, which was pretrial at that point for the development of a potential diminished capacity defense. And at that point, he had only been on the defense counsel who said that, who told him that Mr. Turner's behavior had become bizarre and irrational. And in his conversations, in his meetings with Mr. Turner, he found that he showed certain mental, emotional, and mood disorders, which might support a diminished capacity defense. And he also mentioned, he also included in that application, the diagnosis of ADHD that Mr. Turner had received when he was a teenager, that he had been medicated at quite a high dose of medication until his arrest in the case, and also that he was on some quite strong pain medication as well, including at that point on OxyContin, that changed, I mean, I think the pain medication changed throughout the case, but at that point that he made the application that he was on very strong pain medications as well. And then the district court who had been on the case for longer certainly would have seen in the first trial this evidence of paranoia, these, the accusations that the defense lawyer had been deliberately appointed, that there had been this one day delay in the arraignment so that Mr. Stewart would be deliberately appointed in order to make sure that Mr. Turner was convicted. So there already was in the record the showing of paranoia, also the judge talked about the hypochondria, that at every hearing Mr. Turner would present a list of medical concerns, that he was diabetic, that he had sleep apnea, that he had thyroid cancer, and terrible back pain. How does a judge know, I mean, it's, there's certain behaviors that may be so self-evident, we've related them in our cases, but if a judge looks at a defendant and thinks the defendant is malingering, or putting on a show, which I think is what happened here. That's what the judge found. How can we second guess that? Well, because malingering, the judge absolutely has the, is able to assess credibility, that's certainly one of the things that judges do, and there's no doubt in this case that the district court felt that Mr. Turner was malingering. But malingering is actually a psychological term, it's something that the psychiatrist would have tested for, that's part of the battery of tests, to determine if the defendant is malingering. And as the Supreme Court has recognized, malingering isn't necessarily inconsistent with mental illness. So the district court also says, according to my notes, the vague description of certain mentally emotional mood disorders and bizarre and irrational communications might well apply to many people recently convicted of serious crimes, not merely those who may be experiencing psychiatric disorders. So he didn't think, based on the evidence and his own observations, that it rose to the level that it required a mental evaluation. And the behaviors that subsequently occurred, such as with the razor blades or with his feces in the prison, didn't occur until after the district court ruled. And the district court also had observed the defendant himself. So the question would be, what was submitted or what should have been observed that would have triggered a district court's obligation to grant the motion? Well, my answer would be that in this case, the declaration from the defense counsel said, I've spent time with him. I've been meeting with him at the jails. I've had this one-on-one contact with him. And as defense lawyers, we're not psychiatrists either. And we don't know what the result of any sort of evaluation is going to be. It could certainly be that a report could have come back saying, this is all made up. Mr. Turner is not mentally ill at all. He's just a really difficult, manipulative guy. But when the defense is submitting an affidavit saying, I've spent time meeting with him. I've spent several hours at the jail sitting down with him. I've talked to his defense lawyer who went to trial with him. And we see signs of mental illness. That is strong enough to meet the first prong of that 3006A test. Was there ever any question that he actually had ADHD? There were questions about a lot of other things. But I think with the ADHD, that was quite well established. He presented his doctor records showing the diagnosis, showing that he was taking Adderall at a very high dose. For many years. And then he was off the Adderall. Exactly. After he was taken into custody. Was there ever any exploration of why he was taken off the Adderall? The judge contacted the MDC doctors and they said, well, we looked at him and we didn't see any signs of ADHD. Which I'm not clear what type of doctor looked at him, but I mean, that seems like an insufficient type of evaluation for that condition to just say he's not showing signs of it. He certainly showed signs of it when he was representing himself at the trial. And I think that's the other piece of it. This is that ultimately, Mr. Turner ended up representing himself at trial. And the Supreme Court has said that in Indiana v. Edwards, that the competency standard to proceed pro se is higher than the competency standard just to go to trial when you have a lawyer. And so that does... I'm sorry, I'm not sure I follow. Are you saying, let's say he were diagnosed with ADHD and it was confirmed. Do you think there would be a reason not to go to trial? Not necessarily, no. I mean, I think they needed a... I think half the lawyers in the country go to trial with ADHD. That was the government's point, is that that particular... That's just one piece of the... Well, it's a piece, but it's not a very important piece. Possibly not. It possibly isn't. It has a name. That's why it has a piece. He used to call it something else, being nervous. Well, I think the whole point of... When you say being nervous, then it's a lot less menacing. Yeah. I mean, there are two things. One, he'd had this diagnosis for a long time when it wasn't such a hot diagnosis as it is now. But also that we just don't know what the results of this evaluation would have been. But our point is that there was enough presented to get the funds for the evaluation. It's a judgment call. We'd have to say it's abuse of discretion, right? Yes, that's the standard. And yet in this case, it turns out that the defense was precluded from exploring a defense to the trial charges. It wasn't a defense, because at that point, at least in the 2009 case, that was concluded. And so the government argues, well, there wasn't anything that he could use for sentencing. It wouldn't make any difference. Well, I think diminished capacity can be used as a mitigating factor at sentencing as well. And certainly it could have been also used for a new trial motion. In the 2012 case, we're pre-trial, so there's no question there it could have been used to develop that claim. I'd like to turn to the FREDA issue, if I can. On the FREDA issue, the FREDA waiver in the 2012 case, the government concedes that there wasn't an explicit waiver of counsel. That first FREDA waiver was invalid. The second one, Mr. Turner did not even participate in. But the government is relying on the concept of implied waiver based on United States v. Sutcliffe. And I just wanted to point out that the facts of Sutcliffe are quite extreme. A case where there were six, I believe, defense lawyers, and each time the defendant made it absolutely impossible for the appointed counsel to represent that defendant. In this case, we only had one. In the 2012 case, only one lawyer, Mr. Stewart. And then Mr. Turner was pro se after that. So the government, I guess the district court, offered him another counsel, I guess, Harley. So there was another incident where the district court said, where he asked for counsel. This is in the 2012 case, I think. He asked for counsel. The district court offers to appoint Harley. And Turner said he didn't want Harley. He wanted to interview panel members so he can select one, preferably a female, I guess. And so the court says, well, I'm obligated to appoint a competent counsel. I've offered to do it. He's rejected it. I now find that he's waived his right to counsel. So this was after he had heard the phoretic colloquy that he had refused to agree to earlier. So what do we do with that under Sutcliffe? Does that qualify? That's not enough under Sutcliffe. I'm certainly not saying that the district court was required to appoint a female lawyer from the Los Angeles panel. The district court just needed to appoint conflict-free counsel. And perhaps that would have been Harley. The court found that Harley was conflict-free. Yes. This goes back to the mental health issue, that Mr. Turner believed that Mr. Harley was part of this conspiracy. But the other thing that happened at that hearing was that there was another lawyer there, and the judge said, Mr. Levine, can you take the case? And he said, yes, and Mr. Turner said, I'd like to have Mr. Levine. And then it turned out that Mr. Levine, his vacation schedule didn't work with the court schedule. So I do think that given that Mr. Turner certainly would have accepted appointed counsel and one could have been found, and then we would have avoided all of the incredible difficulties of that 2012 trial. I'm going to reserve the rest of my time for rebuttal. Thank you. Good morning, Your Honors. George Pence for the United States. Over the course of two criminal cases Let me just ask you a question right away because we don't have a lot of time. Did the government object to a psychiatric evaluation here, or was that denied sui sponte by the judge? In connection with the 2009 application? Either one. The district court, the government did say to the district court that it did not believe that the defendant had made a showing of a psychiatric evaluation. So the government did object? Yes, it did. So I'd like to focus on two of the issues that were raised by defense counsel. First is the competency issue in the 2009 case. So the CJA standard's pretty low, it's just what a reasonable defense counsel have wanted to have that expert. But there is an important condition on that standard, Your Honor, and that is that it has to be what a reasonable defense counsel would have done on behalf of a paying client. Now, of course, any lawyer with infinite amount of money would do all that he could for his client. But in this case, the important point is that what a reasonable lawyer on behalf of a paying client has to do is have sought funds to get an expert psychiatric evaluation of his client. In this case, the evidence did not support that such an evaluation was necessary, and here's why. The argument in the application was the defendant needed those funds to prove diminished capacity, but there was nothing in the record that suggested that the defendant had any type of diminished capacity at the time he committed the crimes. Now, if his behavior after the verdict in the 2009 case was vaguely described by his counsel as bizarre and irrational, that is not evidence that the defendant was suffering from a diminished mental capacity when he committed crimes. But doesn't that go to his ability to represent himself pro se in the 2012 case? Certainly the defendant's diminished capacity is an issue with respect to his ability to represent himself. And, in fact, the judge recognized that by consulting the warden and the doctors at the facility where he was being detained, isn't that right? That's precisely correct, Your Honor. Okay. Do you think it's fair to have that decision made based upon an out-of-court ex parte discussion with somebody outside the courtroom itself without the ability of the defense or anybody else to even examine those communications and those conclusions that the judge relied on to determine that he was confident to proceed during the trial? And I'm only talking about the 2012 trial at this point. Yes, I do, Your Honor. I believe the district court judge operated well within his discretion in relying on reports that he received from MDCLA officials, including reports of at least two psychological examinations that were conducted by officials at MDCLA. The district court is not required to conduct, to submit every one of the defendant's medical, purported medical needs to an evidentiary hearing. Maybe not every one, but one that goes to the heart of his ability to proceed pro se to defend himself in a very complicated case, don't you think? Well, no, Your Honor, because I don't think that the defendant in this case made a showing that he had a severe mental illness  because he had ADHD, correct? Okay, regardless of Judge Kaczynski's comments about that, I think we can all agree that it's sometimes overused. But he was on Adderall for many years, a very high dose of Adderall. Doesn't that indicate to you that being taken off that Adderall at least should have been examined, the effects of being taken to somebody with ADHD? I'm not sure that the premise that Your Honor suggested is correct. I don't know that the dosage that he was given of Adderall was a particularly high or a particularly low one. Why don't you know? Did the judge know? I do know that the defendant did not transition directly off of Adderall either. The defendant in the record does say that he was given another drug for a period of time, that it was slightly less effective for him, and that after that he was removed from Adderall. But I do think the judge was entitled to rely on the reports of trained professionals at the MDCLA who were telling him, this defendant is showing signs of malingering. He's not exhibiting signs of ADDHD. He doesn't require the type of medication that he suggests that he needs. So certainly I think it was well within the District Court's judgment to make that type of decision based on the information he was receiving from reliable sources. Another thing to keep in mind is that throughout the course of these two trials, the defendant had repeatedly shown himself to be an unreliable source of information. One instance that is plain in the record is when he lied to the District Court about having been abused by prison guards. He may or may not have known, but that instance was recorded and the District Court was shown that recording and was able to determine that the defendant had in fact lied to the court about his treatment by prison officials. Now, these adverse credibility determinations, the District Court is allowed to carry forward into his decision-making when it comes to any medical treatment that may or may not be needed by the defendant. I would like to also address, Your Honors, the Feretta Colloquy in the 2012 case. And I think it's important here to make this point, which is that a defendant can proceed to trial either with appointed counsel or he can go it alone. And in this case, defendant was given repeated opportunities to retain counsel in the 2012 case. In May of 2013, he requested a 30-day continuance to retain counsel. He never did. In June of that year, he told the court he was within two weeks of getting counsel and counsel never appeared. I'm sorry, what's the point of that? Because the point of this is that the District Court gave the defendant ample opportunity to retain counsel, which I believe is part of the inquiry. You've just repeated yourself. You've just stated the same thing, what the District Court did. What is the point of that? I believe that the District Court's grant of these continuances establishes the correctness of the District Court's ultimate decision to allow a defendant to proceed pro se after he rejected appointed counsel. The point of this is that the District Court gave the defendant ample opportunity to proceed in a fashion. You need the Feretta Colloquy, right? You do, Your Honor. Okay. So either there was or there wasn't. I don't understand what this prelude about how he had lots of opportunities has to do with the question of whether there was or was not a valid Feretta waiver. Let me go right to Feretta, then. Let me go right to the hearing. Well, no, I want to understand the answer to my question. You started down that road and you were telling us something. You must have thought it had some bearing on the issue. And I have no idea why you thought that. So the reason I believe it has a bearing on the issue is because that is what was in the court's mind when it administered the Feretta Colloquy. The defendant — Okay. That's interesting, but what bearing does it have? What possible bearing does that have on whether there was or was not a valid Feretta waiver? What was in the court's mind, what prelude there was to it, and how many chances he had to have a lawyer? What possible relevance does that have to the validity of a Feretta waiver? Because I believe that information is important to understanding what the implied waiver is in this case. As this Court's precedent has pointed out, you are entitled to look at the entire record of the proceedings in determining whether or not Feretta — That's fine. I understand that. And how does this bear on the implied waiver?  You agree there was no actual Feretta waiver? No, I disagree, Your Honor. There was. There was a valid Feretta waiver on July — in July of 2013. The district court properly administered Feretta, informed the defendant of the charges that were against him, the maximum penalties that he faced, and encouraged the defendant But he would not accept it. He disagreed. He did not. He repeatedly either remained silent or said he wanted right to counsel. Yeah, he wanted the right to counsel. Which in the context of having repeatedly requested retained counsel — How can saying that I don't want to represent myself amount to a Feretta waiver? It does when you put that conduct in context with his conduct on July 22nd and July 25th of that year, where the district court said, You may have Mr. Harley as your counsel. He is conflict-free. And the defendant said, I'm going to reject him as appointed counsel. So opposing counsel says that the incident in, I guess, in July where he rejected Harley and the court said, Okay, I find that you've waived the right to counsel. Opposing counsel says that's not enough under Sutcliffe. There has to be more of a record than that. Why is that wrong? I don't believe there's any case law that would support there needs to be more than that. The question is whether there was an implied waiver. Did the defendant, after having been properly administered Feretta warnings by his conduct, demonstrate that he would not proceed with appointed counsel? And that's precisely what the defendant did in this case. It's clear from the record that he wanted retained counsel, but that he was never able to retain counsel. And his insistence on proceeding to trial without. He said he understood the charges against him? During that colloquy, he did not. Did he ever say he understood the charges against him? With respect to the July 2012 case? No, he does not, Your Honor. Okay. But I don't believe that he needs to say that he understands them in order for the court to proceed. I mean, that is part of Feretta colloquy, right? It is. But if that were the case, Your Honor, then the defendant could, by sitting on his hands and refusing to respond at Feretta, effectively prevent the case from ever moving forward. So there has to be an implied consent? It has to be an implied waiver. I do agree he never expressly waived, but he did through his conduct. And I don't believe he can hold the court hostage by simply refusing to answer the Feretta colloquy. The court explains it to him once. He says, I don't understand. It's not like the court went back and said, well, let me say it to you again slowly, step-by-step, and you stop me and tell me where you don't understand. There's nothing like that. The court says it once. The defendant says, I don't understand. And it's left to that. You don't think that, and you think that's sufficient? You think that's sufficient under Feretta? Your Honor, I don't believe he ever said, I don't understand. I may be mistaken, but I believe his response. Did he say, I understand? No, but that's different from saying, I don't understand. But what matters for Feretta is that he needs to say, I do understand. If he says anything else, like, you know, God bless America, it doesn't help. What you need is, yes, I understand. If he doesn't say that, it seems to me the judge can't just go on to the next step and say, okay, I'll tell you the next thing, and there has to be some effort to explain and say, what don't you understand? Isn't that how things work? Surely not answering the question the way you're supposed to can't be the end of the matter. Now, if the judge tries it two or three times and, you know, makes a finding that he's deliberately failing to understand or lying, then that's different. But these are complicated charges. It's entirely possible that he didn't understand. I sometimes look at these things and don't understand. Then what I do is I go back and read them step by step and try to understand them. And even then I don't always understand them. So I don't see how you can stand there and argue that one pass by judge explain the charges and the failing to get the correct answer on the further that, yes, I understand, which is the usual answer because usually they want to represent themselves, but he doesn't get that answer. How that could possibly be a valid further waiver? I mean, you're standing on behalf of the United States, on behalf of the Attorney General of the United States. Is that truly the position that the Attorney General authorizes you to present to this court? Yes, Your Honor. The position is, and I think there are two— You're going to run this video to your supervisor and make sure that that's, in fact, the position of the Justice Department. You know, we're on camera, right? I just want to make sure that, in fact, the Justice Department is taking the position that when the judge gets a no or no answer saying, yes, I understand the charges, that that is sufficient for a valid further waiver. So that's a different scenario, Your Honor. You're describing a scenario that did not occur in this case. In this case, the defendant did not say, I don't understand, please explain it to this court. No, he said, I want a lawyer. I want a lawyer. Which is totally the opposite of the Feretta proceeding. Yes. And it's, it's, I want a lawyer was his way of being obstructionist in the course of the delivery of that waiver. I'm sorry. You have a finding to that effect? Your district judge found that he, that he was being obstructionist? Or is this, is this your characterization? The district court did determine that he had properly administered the Feretta waiver during that colloquy, so I believe— And after you answer my question, you can throw in whatever editorial comment you want. Do you remember my question? Yes. Did the judge ever make a finding that the defendant had been obstructionist? Yes. I believe that that finding is implied in the judge's determination that he had properly administered Feretta. But he did not expressly say that the defendant had been obstructionist. Could I ask you about Sutcliffe? Was there a colloquy in Sutcliffe, a Feretta colloquy in Sutcliffe? In Sutcliffe— I don't recall. Let me review my notes. Just— Your Honor, I don't recall off the top of my head. I'd be happy to submit it. I mean, I thought that in Sutcliffe, the defendant didn't ask to represent himself, but had just gone through six lawyers. And at the end of the sixth lawyer, the court said, although you haven't waived your right to counsel in so many words, I'm going to take it from your deeds that you've waived the rights, and therefore, you will have to represent yourself. So I don't recall there being a colloquy at all in that case. There was a finding, however, that the defendant was deleterious, right? In this case, Your Honor? No, in Sutcliffe. Yes, there was. Okay. There's no such finding here. The district court repeatedly described the defendant as malingering in this case. Malingering has to do with pretending to be sick. That's quite different from being obstructionist. There were repeated findings by the district court that the defendant had undertaken his conduct for the purposes of delaying the proceedings. So I believe that that — Do you specifically refer to saying that the Feretta waiver, that his answer to the — Oh, I don't believe that, Your Honor, no. I don't think he said that in the context of the Feretta waiver. In Sutcliffe, I'm just not sure there was a Feretta waiver at all. There just — the court seemed to base it on different grounds, that he was denying counsel. He kept firing counsel and saying there was a conflict or a breakdown, and the court thought that was for purposes of never going to trial. Yes. I can't recall whether there was an actual administration of a Feretta waiver, but I believe your characterization of the case is correct, which is that I believe after six or seven attorneys were appointed for the defendant in that case, the defendant having fired them all or those attorneys having asked to withdraw, the district court made the determination that the defendant was engaged in that conduct for the purposes of delaying trial, and that that supported an implied finding or an implied waiver of the right to counsel. Okay. Thanks. Unless the court has any further questions for me, I'll sit down. So it's your position that in those circumstances you don't need a Feretta waiver? That's an exceptional Feretta? I'm not trying to put words on your mouth. I'm just trying to understand what I think you said in response to Judge Agudo's question. That if he keeps rejecting counsel, keeps rejecting counsel and is mere obstructionist, the court can simply say, look, you waived your right to counsel, we go to trial. We don't have to warn you about the nature of the charges. We don't have to warn you of the penalties. We don't have to warn you about the risks of self-representation. You waived, and you go straight to trial. So he was warned here, right? Yeah, he was warned here. Yeah, he heard all that. Why don't you answer my question before you answer Judge Agudo's question? Certainly. I do think the defendant needs to be informed of his rights. I don't think it is proper under Feretta for the government to ordinarily proceed without. You're not taking the position that Sutcliffe stands for the proposition you don't need a Feretta waiver if the defendant is being obstructionist? You're not citing it for that proposition? I don't believe so, Your Honor. I was citing it for the proposition that. You do take the position that a valid Feretta waiver has to occur, even if the defendant is being obstructionist. In this case, Your Honor, I believe that Feretta requires the defendant be, his waiver be knowing and intelligent. Let me back up, Your Honor. I actually don't know the answer to your question. I'm confused because Sutcliffe seems to say that the court said, having fully and more than once advised defendants of the risks and consequences in defending himself without counsel and having informed a defendant of the elements of crime of which he is accused as well as the potential penalties, the court now finds in orders that defendant has waived a Sixth Amendment right to appoint counsel. And we have held that, rightly or wrongly. So I would stand with the Court's precedent. I don't understand the point. Why don't you repeat it? Why don't you give me, tell me what that is. In that case, I believe what that case stands for, the proposition is that Feretta requires knowing and intelligent waiver and that there can be an implied waiver where the defendant's conduct indicates that he's... So where does it say implied? It says, in light of defendant's continued antagonism and manipulative behavior, we're satisfied that the district court did not err in finding that defendant knowingly and intelligently waived his right to counsel through his conduct.  In Sutcliffe, the quotation I have is... I thought, I don't know where Judge Cuda is reading from right now, but I thought the quote earlier was that he had been given, told the nature of the crime and the penalties. Sutcliffe. It sounds like that is correct, Your Honor, and that was also the case in Turner's case, that he was informed of his... No, I mean, he didn't say he understood, right? That's true. And the government's position here is that he doesn't have to say verbally, I understand, in order for the district court to proceed, so long as the district court can determine based on the defendant's conduct. That he understands? How do you determine, based on the defendant's conduct, that he understands the nature of a complicated crime, federal crime? I think the point is that he was informed. I don't know that the... But you agree that just being informed is not enough under FRERDA? FRERDA does require knowing an intelligent waiver, Your Honor, so I do agree. So just being informed is not enough. It's very possible to inform somebody of something, particularly as complicated as the requirements of a federal crime, and not have them understand, right? It is possible. It is possible. Yes. And you are not taking the position on behalf of the Attorney General, are you, that just informing a defendant is enough? I believe that... Just answer my question. Are you taking the position that just informing is enough? You also have a very tough moot court. No, Your Honor, I think the point I want to make is that yes... I don't want to know the point you want to make. I want to have an answer to my question. Yes, it can be enough, just having informed the defendant of what was going on. And I think the reason that is the case is that otherwise a defendant could filibuster trial by refusing to answer the district judge's questions at a FRERDA proceeding. And there needs to be some limitation. Do you rely on Sutcliffe for this proposition? I don't believe that's in Sutcliffe. I mean, it's certainly not in FRERDA. That's correct, Your Honor, you're right. It's not in any FRERDA case that I remember reading where it says, well, you can just say it and the defendant doesn't say he understands it. You don't have to make a finding or obstruction or anything else. You can just go on to the next thing. I'm not relying on a case for that. I'm just relying on the practicalities of being a judge under those circumstances, understanding that a reading of these cases that would allow the defendant not to answer during a FRERDA colloquy and thus prevent trial from moving forward does not seem to be what the Supreme Court has in mind in FRERDA and the cases that interpret it. Who knows? Justice Douglas is long gone, so what he had in mind is a good question. That's true, Your Honor. That we'll probably never have answered. Unless there's anything else, I will sit down. Thank you, Your Honors. I appreciate it. I just wanted to make a couple of brief points. One is just to point out that Judge Selma, who was taking the FRERDA waiver where Mr. Turner did not participate as well, was under the impression that there had been a previous valid FRERDA waiver. He had inherited the case, and so he was not the district court who took that. And so the finding that he made that day was, okay, this waiver didn't happen, but that doesn't take away the fact that there was this earlier valid waiver. Well, we all now know, looking back at that earlier waiver, that that waiver wasn't valid. And this one, of course, wasn't even close to being valid. I'd also just like to say that Sutcliffe is a really extreme case. Was there a FRERDA colloquy in that case? I think you're correct that there was not a FRERDA colloquy. At least I don't remember it. I don't remember that either. But what did happen was that for each lawyer, the defendant would be appointed a lawyer, and then the defendant would do something incredibly extreme, like file a lawsuit or threaten the lawyer. And so lawyer after lawyer had to conflict off, saying, you know, I've been the defendant. I think in one case he was forcing the lawyer to go to trial unprepared because he wanted to raise an IAC claim. This happened six times. And so Sutcliffe, you know, is on the books, and, you know, I accept that. But this case is not that case. Where Mr. Turner was saying, I want appointed counsel, when he was offered an appointed counsel, a CJA lawyer who was in the courtroom, he said, yeah, I'll take him. And then it turned out that he couldn't do the case. I understand that there was this, you know, confusion with Rob Harley about whether he would accept Rob Harley, and he insisted that Rob Harley was part of this conspiracy with the district court, and that ties into the mental health issue. But the default in this case has to be that the defendant ends up with appointed counsel, even if the defendant isn't thrilled about having that appointed counsel. But when we don't have a Feretta waiver, that's what we have to do. And the only other point I wanted to make was about the timely application about this showing that there was diminished capacity at the time of the offense because that was one of the problems that the district court judge had with that. There is, you know, there is the facts of the cases themselves, and certainly Mr. Turner's behavior showed this sort of delusional thinking. A lot of what the prosecutor was talking about with the repeated continuances to retain counsel, there was quite a bit of delusion going on and a belief that things were going to happen that weren't grounded in reality, and that was there in the actual charges themselves. In the PSR, there was indication that he had a history of traumatic abuse, and then the documented history of the medication and diagnosis that he had. So I'll stop there. If there's anything else. Okay. Thank you.
judges: Kozinski, Ikuta, Gettleman